Matter of the Transfer Tax upon the Estate of HETTY H. R. GREEN, Deceased.

(Surrogate's Court, New York County, April, 1917.)

Domicil — what constitutes — statutes — evidence — effect of amendment to section 243 of the Tax Law.

Transfer Tax Law — who deemed a resident of state of New York — taxes — evidence — Tax Law, § 220.

Though " domicil " and " residence " are different legal conceptions, " residence " may be used in a statute with the legal significance of " domicil."

The Transfer Tax Law of this state divides the persons who may make taxable transfers into two classes — " residents " and " nonresidents."

The domicil of a widow is *prima facie* that of her late husband and, though she may change it, the change, in order to constitute a new domicil, must be made *animo et facto*.

The amendment to section 243 of the Tax Law (Laws of 1916, chap. 551), which affects the law of domicil only in so far as to continue a residence for the greater part of twelve months, *prima facie* evidence of one element of domicil, construed.

It appearing from the evidence given before the appraiser in a transfer tax proceeding that decedent did not reside in the state of New York for some part of each of twelve consecutive months of the twenty-four next preceding her death, she is not to be deemed a resident of said state for the purposes of the transfer tax within the meaning of said amendment to section 243 of the Tax Law.

Proceeding remitted to the transfer tax appraiser for the purpose of appraising, under section 220 of the Tax Law, the estate of the decedent as a nonresident of this state.

ISSUE as to decedent's domicil in a proceeding to determine a transfer tax.

Alexander & Green (Charles W. Pierson, of counsel), for executor.

Lafayette B. Gleason (John B. Gleason, Charles M. Travis and Kenneth M. Spence, of counsel), for State Comptroller.

FOWLER, S. Upon the petition of Edward H. R. Green, to whom letters testamentary upon the estate of the decedent were granted by the Probate Court of the district of Westminster, state of Vermont, an appraiser was appointed by the surrogate to appraise the property of the decedent in accordance with the provisions of the Tax Law of this state. The executor

alleged in his petition that the decedent was a resident of Bellows Falls, in the state of Vermont. This allegation was controverted by the state comptroller of the state of New York. Witnesses were then produced before the appraiser and examined on behalf of the estate. An issue of residence having been thus raised, the usual stipulation was entered into between the executor and the state comptroller, to the effect that the testimony taken before the appraiser should be used by the surrogate in determining the question of decedent's residence, in the same manner and to the same effect as if such testimony were taken before him. The issue is accordingly now before me for adjudication.

Evidence given before the appraiser on appraisals for tax purposes is generally informal in character, and the common-law rules of evidence, appropriate on trials by jury, are not strictly applied, and, indeed, in legal theory, have little application to such proceedings or inquisitions conducted by appraisers. But when a controverted issue of domicil or residence arises in the first instance, and the evidence is taken before the appraiser only for convenience and then certified to the surrogate for his decision thereon, the ordinary rules of evidence as applied in equity and in the courts of the surrogates are applicable, and the surrogate must consider objections and exceptions interposed by counsel. In this matter I find no substantial error, or no error which makes it imperative that the proceeding should be remitted to the appraiser for further action in conformity with the evidential rules of judicial procedure. I shall notice but the one objection made in behalf of the state to the reception of the affidavit of the executor, verified November 1, 1916. This objection is followed by a motion to strike the affidavit from the record. Such motion is resisted

by counsel for the executor, who concedes in his printed reply-brief that the affidavit is not evidence *per se.* This concession, I think, obviates any necessity for judicial action. The affidavit was filed according to the usual practice on appraisals, and is, when controverted, in the nature of a pleading or statement of the positions assumed by the executor. In this instance the affidavit raises or presents constitutional objections which the executor is entitled to have remain in the record. It should not be stricken out, but as evidence it will be disregarded, the executor having subsequently appeared before the appraiser and given his testimony *viva voce.* It is his testimony, not his affidavit, which is now to be regarded as evidence in this proceeding.

On the hearing before the appraiser on the issue of residence witnesses were called and sworn and documents were introduced. The outline of the testimonial evidence may for convenience be summed up as follows: Hetty H. R. Green, the " decedent," as she is improperly termed under the taxing act, was born on November 22, 1834, at New Bedford, Mass., where her father then resided. The record before me does not disclose where the decedent resided from the date of her birth until immediately before the date of her marriage. It appears, however, that her father had acquired a house in this city of New York in the early part of 1867 and that he was living here at that time, and the decedent then lived with him. On July 11, 1867, she was married to Mr. Edward H. Green. Mr. Green was born at Bellows Falls, Vt.; he was in adult life engaged in business in Manila for some years prior to his marriage and resided there during his absence in the east, although he retained his home at Bellows Falls, Vt. Where he resided at the moment of marriage I shall consider later. Shortly after his

marriage to the decedent they went to Europe and remained there for about eight years. Their children were born abroad. While in Europe Mr. Green sold his dwelling house at Bellows Falls. When Mr. Green and the decedent returned from Europe in 1875 they proceeded to the home of Mr. Green's mother at Bellows Falls and remained there during the summer. Between 1875 and 1879 the decedent and her husband stayed in lodgings or hotels while they were at Bellows Falls. In 1879 Mr. Green purchased an ancestral house at Bellows Falls known as the " Tucker House," and thereafter he and the decedent regularly spent their summers there. Mr. Green died on March 19, 1902. His estate was administered in Bellows Falls as the estate of a resident of Vermont. The record does show that Mr. Green and the decedent, from the time when the house known as the " Tucker House " at Bellows Falls was purchased by Mr. Green in 1879 until the date of his death, spent their summers at Bellows Falls. Mr. Green in fact died in the " Tucker House " at Bellows Falls. After his death the decedent continued to go to Bellows Falls each summer, except her last. The " Tucker House " at Bellows Falls was not occupied during the winter, and when decedent went there in summer she opened the house and stayed in it during the daytime, but she did not at all times sleep in it when alone. For some years prior to 1909 decedent and her daughter, Mrs. Matthew Astor Wilks, lived together, but the record does not show where. Between 1909 and 1916 the decedent passed much time at various boarding houses or hotels or in visiting friends in the city of New York and also much time at Hoboken, N. J. She did not own a residence here, nor did she lease any apartment here by the year. In the boarding houses at which she stayed she usually passed under an assumed name so as to

protect her privacy from invasion. She paid taxes on personal property in the village of Bellows Falls for the years 1910 to 1915, inclusive. After her demise her will was admitted to probate in the Probate Court of the district of Westminster, Vermont, as a will of a resident of that state. In numerous documents executed by her during the years 1912, 1913, 1914 and 1915 decedent described herself as " Hetty H. R. Green, widow, of Bellows Falls, Windham County, Vermont." For some purpose, probably to shorten the inquiry before the appraisers, counsel for the executor conceded certain facts accepted by the counsel for the state comptroller as accurate. It was so conceded for the purpose of this proceeding that from 1902 to the date of decedent's death in July, 1916, she spent the greater part of each year in New York city or in Hoboken, N. J.; that subsequent to 1909 she spent from four to six weeks in each year at Bellows Falls; that the period of time during which she lived in Hoboken, N. J., each year did not exceed six months; that she did not rent an apartment by the year or for any definite period of time, and that she lived the remainder of each year at boarding houses in New York city. It is also conceded that from 1902 until the date of her death the city of New York was the center of her business activities; that even while she occupied a room in Hoboken she came to New York city every day for business purposes, and that during this period she had one or more safe deposit boxes in New York city and kept large deposits of cash in New York banks. The twenty-four months immediately prior to her death she spent approximately as follows: She left New York city for Bellows Falls early in July, 1914, and remained there until about August 18th; she returned to New York city on August 18th, 1914, and stayed here until about July, 1915; from July 20 to

September 1, 1915, she stayed at Bellows Falls and vicinity; she returned to New York about September 1, 1915, and stayed here until about October 1st, when she went to Hoboken and remained there until November 24, 1915; from November 24, 1915, until the date of her death, July 3, 1916, she stayed in New York city, except that she stayed in Hoboken for a few days not exceeding a week at about the beginning of the year 1916. She was eighty-two years of age when she died, and was buried at Bellows Falls, Vt. Such in outline is the evidence now before me; and I shall refer to it more in detail as I proceed.

The record discloses that the question certified to me for decision concerns the last residence of Hetty H. R. Green, not her last domicil (see stipulation in the record). In *Matter of Martin,* 94 Misc. Rep. 81; in *Matter of Morgan,* 95 id. 451, and *Matter of Norton,* 96 id. 152, I endeavor to point out that domicil and residence are not synonyms in law, and that the Taxable Transfer Act of this state expressly designates two classes of persons subject to taxation, " residents " and " non-residents," and that in reality the principle of domicil was only applicable by way of analogy. But the Appellate Division in *Matter of Martin,* 173 App. Div. 1, held, as I read their decision, that " residents " in the act meant those " domiciled " here. Thus the question certified to me, under the decision of the Appellate Division, is really one of the last domicil of Mrs. Hetty H. R. Green. Domicil is a term of art, with a settled significance in law. I shall have occasion again to refer to the distinction between domicil and residence before I conclude.

This matter involves, then, not only a " domicil," but the " principle of domicil," the application of which is of acknowledged difficulty where the subject of the investigation has two or more residences in dif-

ferent states or jurisdictions. It has been said in England that the " principle of domicil " better expresses what common lawyers mean by " domicil." The cause has been ably presented by counsel for both the state and the executor. They have not hesitated to refer to the primary sources of domicil, the Civil Law, *jus gentium,* and modern private international law, in addition to their citations of decisions of our own state.

In the long course of the modern development of the principle of domicil it was early admitted that a person might have as many domiciles as he had residences. But modern convenience or necessity has altered all this, and it is now held, in both English and American law, that a person can have but one domicil at a time for most legal purposes. *Forbes* v. *Forbes,* Kay, 341; *Dupuy* v. *Wurtz,* 53 N. Y. 556. He may be subject to various jurisdictions without inconvenience, but not to more than one law, and that law is with us to be determined by the principle of domicil. It has been said by publicists that to some extent the principle of domicil in the law of America has been slighted by a tendency to substitute the place of contract for domicil as the determining factor in too many cases. But be this as it may, in cases of this particular character, the principle of domicil is allowed to be controlling. A brief reference to the growth of the principle in our law is suggestive. As early as 1744, in *Pipon* v. *Pipon,* Ambler, 25, Lord Hardwicke intimated that domicil was the true solution where there was a conflict of laws in the same empire relating to successions to immovables. This was followed in 1750. *Thorne* v. *Watkins,* 2 Ves. Sr. 35. There the English precedents, which are part of the law of this state by constitutional limitation, end. Lord Loughboro's judgment in 1791 in *Sill* v. *Worswick,* 1 H. Bl. 690, comes too late to

Surrogate's Court, New York County, April, 1917. [Vol. 99.

prescribe a rule which became a part of our territorial law. Since Independence the decisions of American courts have only amplified principles found elsewhere.

This matter now before me indicates the importance of some definitive law regulating the status of a citizen of a particular state of the Union sojourning or residing for some period out of that state, and in another state of the Federal Union. It also indicates, in some degree, the importance of determining the powers and the authority of the federal government to adjudicate the rights of citizens of particular states of the Union residing or sojourning within the borders of a state not their own. If there is no such federal law, then some day there will have to be a revision of the Constitution so as to enable the federal courts to determine the conflicting claims of tax collectors of different states against federal citizens who are also citizens of particular states.

In such conflicts there is already, I conceive, a primary principle which is rarely considered by state courts in cases of this character. Under the Fourteenth Amendment to the Federal Constitution every citizen now has a national citizenship, as contradistinguished from his or her citizenship of a particular state of the Union. *Slaughter House Cases,* 16 Wall. .36, 73; *United States* v. *Cruikshank,* 92 U. S. 542. The federal law regulating national citizenship alone determines the nationality of an American, as contradistinguished from his domicil, and it ought, I conceive, to be controlling in cases of this character, where a citizen of the United States is claimed to be domiciled legally in two or more states of the Union. That the federal law is here controlling I do not say. It is quite unnecessary in this cause to go so far. But where there is a conflict of state laws on the *status* or state

Misc.] Surrogate's Court, New York County, April, 1917.

citizenship of a particular citizen of the United States, the collision or conflict seems to present a federal question within the true meaning of the amended Constitution, and in the interest of order and good government it would be highly convenient if the federal law comes to be supreme on this point throughout the United States, just as the law of imperial Rome came to be supreme on all disputed points over Italian particularism and provincialism. In other words, particularism or provincialism should in America give way to some higher principle or authority, in order that the rights and dignity of federal citizens may be properly maintained throughout the Union. If not now territoriality in the instance of federal citizens will at a time not long distant defer to nationality. Then if the courts of Vermont shall hold that "A," a federal citizen, is a citizen of Vermont and the courts of New York shall also hold that he is at the same moment a citizen of New York, the nation may step in, in order that the evil consequences to "A" may be impartially prevented, or equitably adjusted, in some federal or national tribunal. This extension would be but an amplification of the theory of our Federal Constitution which makes federal law the arbiter of controversies between states or citizens of different states. It is of course probable that the judgment of the state court, first in order of time determining the liability, would be held binding and given effect everywhere by federal law, but this might be at the expense of the real principle of domicil or state citizenship. Such temporary evasions do not benefit in the end the substance of constitutional law.

I will not attempt to say what the federal law is on such points as those indicated, for no such points are before me for decision. But I will venture to say that it would be highly expedient in a federal republic, even

Surrogate's Court, New York County, April, 1917.   [Vol. 99.

where there is no active contest betwen the states of the Union over the particular state citizenship or the domicil of a deceased citizen of the United States, if conflicting assertions of two or more states against those taking the succession of the deceased citizen of the United States under the laws of one particular state could be made justiciable in some federal tribunal. Otherwise in America there will soon prove to be either too much law or too little for the convenience of a great country. At present neither nationality nor domicil, indeed not even the situation of property, seems controlling on the action of our state courts. Some controlling and definite principle should be soon enounced by competent authority. The hardship of subjecting personal property to a variety of succession duties, imposed by different sovereign states, was, I think, brought up in The Hague conference of 1900 upon private international law, but they did not act on it. It has been since proposed that the state which governs the succession to personalty should alone have the right to impose death duties. This seems an equitable proposition. The ominous and distressing increase in the necessities of states renders the burdens of double, treble or even quadruple succession duties, which they now seek to impose, a menace to private property, as understood for a period of at least five hundred years. What the ultimate effect of such excessive taxation will be on high civilization is not to my mind doubtful, although some persons in the states are inclined to disregard it.

Until all such questions as those outlined are set at rest by some supreme law of this nation, we are left in that condition of uncertainty which prevailed everywhere in Europe in the sixteenth and seventeenth centuries, when it was held that the law of the territory where one's personalty was found to be prevailed. The

maxim then was: " *Bona tam mobilia quam immobilia regulantur juxta leges regni et loci in quo bona ea jacent et sita sunt.*" As late as 1630 it was still maintained by publicists, " *Bona personam non sequuntur, sed personas ipsas ad se trahunt.*" It was subsequent to the year 1700 that the maxim " *Mobilia sequuntur personam* " began to prevail as part of the *jus gentium* of Europe. Since then its recognition has become general throughout Christendom. The principle " *mobilia sequuntur personam* " is better expressed by the Civilians, " *mobilia inhaerent ossibus domini.*" But neither maxim gets us much ahead in determining a controverted modern domicil.

In the law of nations the nationality of a person whose status or right is in controversy is now generally the controlling factor, and that once determined, his public right and obligations are reasonably clear. But in a great federal state like the United States, or the modern Empire of Great Britain, the principle of nationality does not respond to actual requirements and therefore we in this country are driven to the principle of domicil, which is consequently much emphasized in the local laws of both England and America. Indeed, in respect of the personal property of a citizen of the United States, domicil has become extremely influential, if not always controlling. Westlake distinctly states that in England and the United States " domicil is the only possible criterion of a person being an Englishman or a Scotchman, a Marylander or a Louisianian." Internat. Law (Eng. ed.), pt. 1, p. 211. While this is true, there are some signs of reaction in this country. The tendency of modern state legislation in America, at least for the present, is to reassert the old supremacy of territorial law in respect of the personal property within the territory belonging to those not domiciled in the legislating

38

Surrogate's Court, New York County, April, 1917.   [Vol. 99.

state.  In other words, the present tendency is for the
state authorities to deny the complete force of the long
established maxim, *" Mobilia sequuntur personam."*
If there is any federal power to correct this reaction,
and I for one venture to believe that there is, it should
be promptly invoked in the interest of the higher citi-
zenship of the United States.

Although the question is not directly before me in
this matter, I deem it my duty to make plain the real
issue where there are conflicting claims of the states
of the Union to tax citizens of the United States.  If
a citizen of Vermont, for example, enters the territory
of New York state, sojourns there and dies there, what
is the true extent and power of New York over the
personal property or the succession coming from the
said citizen of Vermont?  In other words, is a citizen
of Vermont subject to the laws of Vermont in any
respect while resident in New York, or does he by a
mere change of residence cease to be a citizen of Ver-
mont and become subjected to the laws of New York
only?  So when the citizen of Vermont comes to die
in New York is it the law of New York or the law of
Vermont which ought to regulate the succession to his
estate?  These, if analyzed, are important questions.
That there are certain general principles to be found
in the law of nations which may determine the rule
in each instance no one will deny.  The trouble is that
in fact they do not determine it.  There is no law of
nations which is binding equally on Vermont and on
New York, and no rule unless it is some federal rule
which serves between states of the Union as a law of
nations.  If there is now no federal rule, such a con-
dition of things ought not long to be suffered to con-
tinue in a great federal domain like that of the United
States.  To allow the uncertainty to remain will prove

prejudicial to the free intercourse contemplated by the Federal Constitution.

In my judgment the logical consequence of the decisions of the United States courts on the Fourteenth Amendment is that there is now a supreme federal law which ought to determine all such questions as those just outlined or intended to be suggested. *Matter of Morgan,* 95 Misc. Rep. 453. If this theory is sound, every case involving a conflict of state laws relative to the right of taxation on a succession from a federal citizen could be drawn into the federal courts in some way or at some time. If, on the other hand, this theory is erroneous, then I submit with all due deference that certain resonant statements in some great cases in the Supreme Court of the United States would have been more useful had they been pronounced with greater reserve. It may be well to emphasize at this point that on the continent of Europe the tendency is to presume that domicil is always determined by nationality, but it is not so in the United States or in the British Empire. I shall not, therefore, in the course of this opinion refer to the text of modern continental jurists. In this matter the surrogate is, as of course, bound to defer to the law of New York. While there is a modern tendency toward a community of law bearing upon interstate controversies, yet I apprehend that if there is any domestic law of New York bearing upon domicil the surrogate must follow it unreservedly. This is not a public court where principles of *jus gentium* are of supreme authority. This is a private court of a state, although it proceeds most generally *in rem.*

Fortunately, then, I am relieved from the necessity of considering high federal questions in this matter, for under the construction of the Appellate Division the only question now certified to me for decision is

the last domicil of Mrs. H. H.R. Green at the moment of her death, and this is largely, though not altogether, a question of fact to be determined on the evidence. Unfortunately for its easier solution, domicil is not a pure question of fact. It is, more accurately speaking, a mixed question of law and fact, *i. e.,* the facts to be found may or may not establish domicil in law. The learned Phillimore correctly states, without reservation, that every question of domicil is one of law and fact. This being so, the question of Mrs. Green's last domicil becomes one of some difficulty under the authorities. The learned Appellate Division of this department has, however, relieved me from the necessity of considering whether commorancy or domicil is the real test of liability under the " Taxable Transfer Acts " of this state, for, in *Matter of Martin,* 173 App. Div. 1, they hold, as I said at the outset, that it is domicil and not residence which controls. I expressed my own doubt on this point in *Matter of Norton,* 96 Misc. Rep. 152, because the Transfer Tax Act expressly taxes residents, not those domiciled here. But under the decisions of the Appellate Division just cited the question certified to me for adjudication in this matter is not really the last " residence " of Mrs. Green, but her last " domicil." I am content to assume that this ruling of the Appellate Division is binding on me in this proceeding. In *Matter of Wrigley,* 8 Wend. 140; *Frost* v. *Brisbin,* 19 id. 11; *Haggard* v. *Morgan,* 5 N. Y. 422; *Bartlett* v. *Mayor,* 5 Sandf. 44, and *Matter of Newcomb,* 192 N. Y. 238, it was, however, held that domicil and residence are not in law synonymous. In *Bell* v. *Kennedy,* L. R. (1 Sc. App.) 320, Lord Westbury came to the same conclusion. The Roman law distinguished residence from domicil. D. 4, 6; D. 50, 17, 124. The decision of the Appellate Division in *Matter of Martin* is, however, in

accord with the modern conception of publicists generally, and it relieves the issue in this matter of many embarrassments.   It is said by publicists:  "On the domicil of a capitalist rests the question of the government by which his personal taxes are to be imposed." Whart. Confl. Laws, § 20.   Beale, the latest commentator on private international law, agrees with this when he says that domicil determines *status* in all common-law countries.   Confl. Laws, pt. 1, p. 174. What, then, is this *status,* termed domicil, which is the crux of this inquiry?

It would be useless to refer to all the discordant definitions of domicil contained in the writings of publicists and in adjudicated cases.   All such existing definitions fail at times to respond to particular requirements.   That domicil in the common law denotes principles different from both Roman and early English law, Westlake states (p. 259, *et seq.*). Indeed, Lord Westbury has said that domicil now " is an idea of law."   *Bell* v. *Kennedy, L. R.* (1 Sc. App.) 320.   Certainly " domicil " in modern law is more than a residence, because it may exist without residence. Ortolan, 599.   " Domicil " now is, I venture to think, the place which in law relatively determines the personal law to which a man or a woman is subject in the absence of any exceptional circumstances subjecting them to another law.   Domicil is not in the law of our state determined by nationality, nor is it determined by residence alone in the absence of proof of *animus manendi* or *animus revertendi.*   These points are, I think, established in this state beyond all controversy.

There is at common law no exact definition of domicil which responds to all purposes.   Dicey Confl. Laws, 89; Wharton Confl. Laws, §§ 21, 22; Wheat. Internat. Law, 394; *Forbes* v. *Forbes,* Kay, 352.   Mr. Dicey, in the last edition of his works, has much simplified his

former precise and complex definition of domicil which I quote in *Matter of Robitaille,* 78 Misc. 112; *Cf. Matter of Norton,* 96 id. 154, 155. In my opinion, domicil is not determined by residence alone, nor by intention alone. Residence is preserved by the act, domicil by the intention. Ortolan, 599. A person may be absent from his domicil without effect. In the Roman law, absence from a domicil was treated with much refinement as " praiseworthy, blameless and dishonorable." D. 4, 6. I shall notice these distinctions at a subsequent place, for they are very indicative of subtle modern distinction.

The differences between Roman and Anglo-American law are obvious. In Roman law the question of domicil was immediately connected with that of local citizenship. Rome was the common country, or, as Modestinus said, *" Roma communis nostra patria est."* D. 50, 1, 33. The question in Roman law was who was a " civis " or " municeps?" D. 50, 1. While the conceptions relative to all such points were in Roman law beautifully worked out, so much so as to be regarded as the basis of all modern law on domicil (Bentwich Domicile & Succession, 32), yet the Roman law does not respond to all modern exigencies and it has consequently been largely supplemented in England and America by conceptions of increasing value. In English and American law domicil relates to territory, not to localities within a political territory.

Notwithstanding the differences pointed out, the Roman definition of domicil, elaborated by the Civilians, must long remain influential in our common law. It is quoted at length in the elaborate brief for the state submitted to me in this very matter. It was referred to by Lord Mansfield in 1762 in the leading case of *Burns* v. *Cole,* Amb. 414, in the Privy Council, although not there reported, and frequently since in

adjudications of authority in all courts. The Latin text of the definition is quoted and translated by our most learned Story at length. Story Confl. Laws, § 42. Story, like Savigny and all publicists, made free use of Latin writers, especially the Pandects. To Story, Latin was a practical organon. The definition of domicil taken by Story, Senior, from the *Corpus Juris,* but not quite correctly transcribed in his Conflict of Laws, is this (C. De incolis 10, 39, 7) : *" In eodem loco singulos habere domicilium non ambigitur, ubi quis larem rerumque ac fortunarum suarum summam constituit; unde rursus non sit discessurus, si nihil avocet, unde cum profectus est, peregrinari videtur, quod si rediit, peregrinari jam destitit."* This definition is, as I said, cited to me in the brief for the state as a persistent definition of domicil. I shall have some observations to make on it in a more appropriate connection.

It is maintained, as stated at the outset, in common-law countries that a man can have only one domicil for most juridical purposes (*Matter of Newcomb,* 192 N. Y. 238; *Dupuy* v. *Wurtz,* 53 id. 556; *Forbes* v. *Forbes,* Kay, 341), and that every one must have a domicil. In passing I may observe that although this principle is distinctly denied in Roman law (D. 50, 1, 27), and is obviously untrue in some modern cases, yet I shall give heed to it as a matter of course, even if it is apparent that a foundling of unknown parentage, one who is a vagrant, for example, has no domicil, either of origin or of choice, either in law or in fact. One of the greatest judges in the history of this state, Edmunds, denied the accuracy of the proposition that every one must have a domicil. But this point is not now precisely here, and it need not be further considered.

Looking at her life history, it is evident that Mrs. Green's domicil of origin was Massachusetts. The

effect of her father's subsequent removal to New York before her marriage does not figure in the case. Her husband's domicil of origin was Vermont, and this is not controverted. The evidence submitted to me also discloses that at the time of his marriage Vermont continued to be Mr. Green's domicil. His prior business residence in the east, at Manila, was of a temporary and commercial character, insufficient to change his nationality or his domicil. I think that there is a presumption in the common law that an American merchant residing in Asia or in the east intends to resume his national domicil or domicil of origin in the absence of clear proof to the contrary. The proofs before me certainly disclose that in 1867, at the time of his marriage, Mr. Green's domicil was again in Vermont. Vermont, then, in the absence of positive proof to the contrary, was what is termed the matrimonial domicil of the spouses. Mrs. Bancroft, a witness called for the estate, testifies that immediately after his marriage Mr. Green brought the decedent as a bride to Vermont and there they occupied a house.

Marriage is an international institution and more than a contract. It is, as Lord Stowell said in *Dalrymple* v. *Dalrymple*, 2 Hagg. Con. 63: "*principium urbis et quasi seminarium reipublicæ.*" Story confirms this conception of the marital relation. Confl. Laws, § 108; Whart. Confl. Laws, § 127. And see *Hyde* v. *Hyde*, 1 P. & D. 130, 133. Consequently in all systems of law marriage creates a novel matrimonial domicil for the wife wherever her prior domicil may have been. At common law the matrimonial domicil of a wife is that of the husband at the time of her marriage. Westlake Priv. Internat. Law, §§ 361, 366; Whart. Confl. Laws, § 189; Dicey Confl. Laws, 511; Bentwich Domicile, p. 33; Merrill Confl. Law, 68.

Whatever Mrs. Green's domicil of origin, or her

later imputed domicil of her father's subsequent choice, may have been, it was fully supplanted by her matrimonial domicil which was Vermont. Story Confl. Laws, § 46; Whart. Confl. Laws, § 189; Dicey Confl. Laws, 640, 643; Savigny Pri. Internat. Law, 56; *Dalhousie* v. *M'Doual,* 7 C. & F. 817; *Yelverton* v. *Yelverton,* 1 Sw. & Tr. 574; *Whitcomb* v. *Whitcomb,* 2 Cur. 351; *Hunt* v. *Hunt,* 72 N. Y. 217, 242.

The husband of decedent lived at the matrimonial domicil prior to the time of his death, and there he died and was interred in the last resting place of his respected and respectable fathers. A widow, in the absence of adequate proof to the contrary, retains the last domicil of her husband. The Roman law on this point, *" vidua mulier amissi mariti domicilium retinet "* (D. 30, 1, 22), is cited by Story with express approval, and it is adopted in all countries without exception. It is needless to enlarge on a proposition so universally accepted in all systems of law.

That a widow being again *sui juris* and no longer in law or in fact *sub potestate viri* may change her domicil (*Gout* v. *Zimmerman,* 5 N. C. 440; *Warrender* v. *Warrender,* 2 C. & F. 488) is not now questionable, and it is consequently contended in behalf of the state of New York in this proceeding that Mrs. Green, the decedent, did change her matrimonial domicil, and that she became domiciled in New York where she died so domiciled. This, however, is expressly denied by the representatives of Mrs. Green. Domicil is, therefore, the real and the only issue now here. I shall briefly survey again the proofs and contentions on this particular issue before proceeding to consider the law of the case.

That the Tucker House at Bellows Falls, Vt., at some periods of longer or shorter duration, was the " home " and the only actual home of the Green fam-

ily after 1879, and during the rest of decedent's married life, the evidence before me, such as it is, amply discloses. If it is controlling that the home of the Greens is coextensive with their domicil and that Vermont was the matrimonial domicil of decedent until her husband's death, then I apprehend that the solution of the issue of decedent's last domicil is somewhat facilitated. That Mr. and Mrs. Green themselves regarded the Tucker House as their only home is apparent from their conduct and declarations given in evidence. That their actual residence at their titular home was intermittent is, however, also apparent. But even if absence therefrom be conceded, they had no other home during the husband's life, subsequent at least to his acquisition of the "Tucker House."

After her husband's death, Widow Green, the so-called decedent, according to the false terminology of our statute, when physically able passed her summers at Bellows Falls, Vt. The title to the Tucker House had devolved on her and the property now forms part of her estate. It was a furnished residence of some pretensions and long family associations. It was unquestionably the only "home" or permanent abiding place of a residential character that either Mr. or Mrs. Green is shown to have possessed during their whole married life. There their children were nurtured and partly educated, or brought up. But after her husband's death in 1902, and indeed to some extent before then, decedent passed more or less time away from Vermont in the transactions of her great business affairs in or about the city of New York. She passed portions of the summer only in Vermont, with the exception of the year 1916, when she did not resort to Vermont, being then too fatally ill in the city of New York. The controlling evidence on this point, stated in the admission of counsel,

accepted by the state as correct, is as follows: " From the date of the death of the decedent's husband in 1902 down to the time of her death in July, 1916, the decedent spent the greater part of each year in New York City or in the vicinity of New York City, to wit, at Hoboken, N. J. Prior to the marriage of her daughter in the year 1909 she was in the habit of spending the entire summer season in Bellows Falls, Vt., except for occasional short business trips to New York City. After her daughter's marriage she ordinarily spent from four to six weeks in each year, except 1916, at Bellows Falls. The remainder of each year she spent in Hoboken, N. J., and in New York city, with the exception of short and infrequent periods when she was in Boston and other places on business matters. Her stays in Hoboken, N. J., did not exceed an aggregate of six months during any one year. While at Hoboken the decedent ordinarily stayed in apartment houses belonging to the Hoboken Land and Improvement Company. The decedent did not rent an apartment by the year or for any definite period of time, but occupied whatever apartment might be vacant and available for her use, relinquishing it when she left Hoboken. During the remainder of each year the decedent was in the city of New York, staying at various boarding houses and hotels and at houses of her friends."

The accepted admission of fact discloses that decedent, while absent from Vermont, passed as much time in the state of New Jersey as in the state of New York. She seems to have divided her sojourns between New York and New Jersey. This fact seems to me fatal to the pretensions of the state of New York that her domicil by reason of a *de facto* residence during all her absence from Vermont was in the state of New York. While actually in New York city (and it

is not pretended that decedent was elsewhere while in New York state) Mrs. Green flitted from furnished lodging to furnished lodging. She had no permanent home in New York. At times she even visited friends in the city of New York. It cannot, however, be gainsaid that decedent passed much of the latter part of her life in New York city, engaged in the actual transaction of her vast business. But that she ever had a home in New York, or that she had a home anywhere out of Vermont, the evidence does not disclose.

That a domicil is in law in some way connected with the " home " or principal residence or abiding place of a person most systems of law and most jurists concede. Story Confl. Laws, § 41. The Roman definition of domicil cited by the state and quoted in this opinion at length is susceptible of greater emphasis on the element of home than even Mr. Dicey attributes to it in his somewhat novel exploitation of this element of domicil. Confl. Laws, 83, 84. English publicists rarely resort to such illustrations. Mr. Dicey evidently attaches new and far reaching importance to the legal definition of " home " as an element of domicil, at the same time admitting that " home " is not yet a term of art. He even elaborates a new and striking legal definition of " home " as an element of domicil. His observations are acute and convincing. It may, however, be not amiss for me to call attention to the fact that Mr. Dicey's emphasis of *home* as an element of domicil is much fortified by a translation of " *larem* " as " home " in the Roman passage transcribed in this opinion. Such a usage is quite justified, I think, by classical writers. Cicero, Virgil and Horace used " *lar* " in the sense of " home," although " *domus* " or the locative " *domi* " is undoubtedly the commoner Roman word for " home." Of Anglo-Americans Mr. Dicey is not alone in attaching importance to the fact

of home in a solution of domicil.  The distinguished lawyer, Mr. David Dudley Field, of our own bar, in his celebrated International Code (§ 280) defines domicil as "the seat or permanent residence — the *home*." This, after all, is only a reversion to the main principle of Roman law (D. 50, 1; Cod., 10, 39) and the systems founded on it.  Story Confl. Laws, § 41.  Some further observations on the identity of the home and domicil in the origins of our law may not be amiss or misconstrued.  They go to the root of our law.

That the Romans, as well as Mr. Dicey, regarded the "home" as a controlling element of domicil is, I think, apparent.  *Domicilium,* indeed, primarily denotes "*home*."  Cicero, no inconsiderable jurist, in a passage in the "De Senectute (C. 21, ¶ 77), which I happened on the argument to remember, evidently means by domicil the home: "Est enim animus caelestis ex altissimo *domicilio* depressus et quasi demersus in terram, locum divinae *naturae* aeternitatique contrarium."  In this beautiful passage of Cicero *domicilium,* it will be observed, stands for "real home" in the English tongue.  The root "cel" in *domicilium* is said by the professional scholars to appear in "*celo*" and "*cella*" and the word "*domicilium,*" in the passage in the "De Senectute" just transcribed, is intended to convey the idea of a private and particular residence.  It may be urged that De Senectute is a philosophical treatise, not a technical treatise like "De Legibus."  But this fact does not detract from the meaning of *domicilium* in the passage cited.  Nothing more is necessary to be added to emphasize what Mr. Dicey so admirably states concerning the importance of the element of an established "home" to any complete legal definition of domicil. I have now pointed out that the definition of domicil, taken from the Roman law and quoted by Story with

approval and cited by the state in this proceeding, refers to " a home " as a criterion, and that the term *domicilium* itself intends the true home of the person whose status is the subject of inquiry.

While I remain quite of the opinion of Mr. Dicey that an established home is an important element of domicil, I do not overlook the fact that the mere possession of a house in a foreign place does not establish a domicil there. The Roman law was to that effect: " *Sola domus possessio quae in aliena civitate comparatur domicilium non facit* " (D. 1, 17, 13). But Mrs. Green's " Tucker House " was, I think, to her something more than the mere possession of a house. The house itself was her only regular or fixed home, and that home was at her matrimonial domicil. That home and no other was the seat of the really important associations of her entire married life.

It is, however, urged by the state that Mrs. Green's long continued absence from her Vermont home, and her protracted sojourns in New York are conclusive of a change of domicil without proof of her *animus*. But in *Dupuy* v. *Wurtz,* 53 N. Y. 556, 561, this proposition was, I think, denied, both in substance and in principle. I am not inclined to ignore the force, in the law of domicil, of a long continued actual residence, for I recognize that some jurists of distinction attach weight to a protracted residence as evidence of domicil. Westlake says: " Time is the grand ingredient in fixing domicil." Int. Law. pt. II, 114. Savigny, when criticising the modern concept, " domicil of origin," says: " Scarcely any course is possible but to assume a residence to be the domicil." Priv. Internat. Law, 87. But this in effect is only what Lord Thurlow states in *Bruce* v. *Bruce,* 3 Pat. App. 168; 6 Bro. 566; 2 B. & P. 230, that " residence is *prima facie* evidence of domicil." And see Story Confl. Laws, § 46. Now, when a

Misc.] Surrogate's Court, New York County, April, 1917.

thing is only *prima facie* so, the presumption is not one of law, but a mere rule of procedure. Certainly absence from an established domicil, no matter how long, does not *per se* constitute a new domicil or destroy the validity of the old domicil. I referred before to the classifications of absences from domicil made in the Roman law (D. 4, 6). An absence in that system might be praiseworthy, blameless or dishonorable. If on necessary business the absence was blameless, possibly praiseworthy, and did not prejudice or destroy the domicil. I applied this distinction in *Estate of De Lancey A. Kane,* 93 Misc. Rep. 406, where the deceased gentleman was shown to have been absent from his domicil for years, detained in New York by reason of an incurable illness. Such an absence I held was immaterial to his domicil of origin.

It is undoubtedly true that a long continued and nonintermittent residence in one place may conclusively negative in law a pronounced or declared intention to retain a domicil in another place to which the declarant or *" de cujus "* never resorts. This is merely an established exception to a general rule. Mr. Justice Holmes, in *Dickinson* v. *Brookline,* 181 Mass. 195, states the exception as follows: " Of course the argument for the plaintiff is that his domicil is presumed to continue until it is presumed to have been changed, that it would be changed only by his intent and overt act, and that he expressly denied the intent. The ambiguity is in the last proposition. The plaintiff did not deny that he intended to keep on living as he had lived for the last few years, and if the jury saw fit to find, as no doubt they did, that he did intend to do so, then he did intend the facts necessary to constitute a change of domicil, and that he did not intend was simply that those facts should have their inevitable legal consequences. * * * *When you intend the facts to*

*which the law attaches a consequence, you must abide the consequences, whether you intend it or not.''* This exception is confirmed in *National City Bank* v. *Hotchkiss,* 231 U.· S. 50, 56, and elsewhere. Dicey Confl. Laws, 116, citing *Matter of Steer,* 3 H. & N. 594; Wheat. Internat. Law, 245; 6 Halsbury's Laws of England, VI, 186. I myself applied this exception in *Matter of Morgan,* 95 Misc. Rep. 451. But the facts and conditions, shown in all these cases last cited, justified the application of the principle or exception last stated. In this matter now before me Mrs. Green's residence in New York was of a character which makes the exceptional principle, I think, not controlling here. The Roman law, it should be observed, contained the same exception: *Domicilium, re et facto, transfertur non nuda contestatione* (D. 1. 1, 20), which Phillimore translates as follows: '' Change of domicile is proved by facts and action, not by a simple declaration.'' If we translate '' *nuda* '' by our word ''mere '' and not by '' simple '' the Roman text precisely confirms the exceptional principles last denoted.

Mrs. Green had no home in New York. While here she resorted to various furnished lodgings, colloquially called '' boarding houses,'' and her stays at them do not appear to have been either continuous or long. Her habits, in so far as these lodgings were concerned, were migratory. She can hardly be said even to have '' lived '' in them. She stopped at these peculiar inns because she was forced to be in or near the monetary center of the United States in order to conduct her financial affairs. She evidently found the boarding houses secluded and, what was more to her later taste, inexpensive. But she evinced no permanent intention of abiding in them, or of founding a permanent home in them in New York. Indeed, it is manifest that this is just what she did not intend to do. When a man or

Misc.] Surrogate's Court, New York County, April, 1917.

woman, stopping away from an established home of repute, resorts to inns or furnished lodgings, the presumption of law is that the stay, no matter how long, is of temporary character. Cicero well expresses the temporary nature of any resort to inns: *Commorandi enim natura devorsorium nobis non habitandi dedit.* De Senectute, 84. I may point out that in this passage *commorari* is the usual Latin word for staying at an inn. See Page's notes to his edition of third Ode of Horace, Lib. II. Lord Shaftesbury also well said: " If unhappily a man had been born in an inn   *   *   * he would hardly, I think, circumscribe himself so narrowly as to accept a denomination or character " (*i. e.,* domicil) " from those local circumstances." Domicil, as we remember, is always a mixed matter of fact and law, dependent on both residence and intention — *factum et animus* (Story Confl. Laws, § 44), just as Lord Shaftesbury obviously implied in the passage quoted.

It is quite competent in cases of this character, when the intention of a person is necessary to be established in order to constitute a domicil, to analyze the elements of legal intention and for that purpose to weigh all the probabilities. The deceased lady and her husband, I may assume, were familiar to the old fashioned inhabitants of this city, for it is apparent that they had extensive connections here among those generally known by old fashioned Americans. They were by origin substantial New England people of good position, good birth, long traditions and excellent American associations' both here and elsewhere. They well knew, I think, the difference between a " lodging " and a ." home," between a residence and a domicil, and it is perfectly obvious from the evidence that Mrs. Green appreciated that she ought to have a regular family "home," and from her many declara-

39

Surrogate's Court, New York County, April, 1917.   [Vol. 99.

tions in evidence it is also apparent that she intended to have her legal domicil at that appropriate home. That she was, after her husband's death, most away from her home or domicil does not completely negative this plain intention.   She was in later life apparently obsessed and overwhelmed by her large possessions and to some extent her obsession came to interfere with her old traditions, mode of life and natural associations; but I think it is apparent that she never willingly relinquished or abandoned her respectable and established domicil in Vermont for a lodging in New York.

The issue of domicil is now so complicated by modern conditions regulating mobility and by the incessant interlocking of local governmental and territorial regulations that an astute people, the French, see fit to provide in advance for its judicial solution.   They allow the proof of intention — the main element of domicil — to be deduced from a declaration filed either in the city a Frenchman is quitting or in the one to which he resorts.   Civil Code, § 104: '' La Preuve de l'intention resultera d'une declaration expresse faite tant à la municipalité du lieu que l'on quittera qu'a celle du lieu ou l'on aura transféré son domicile.'' Can there be any doubt on the evidence before me that if this excellent law had been in force in the United States of America Mrs. Green would have formally declared Vermont to be her domicil and not New York?   I think there is no doubt of this, as her so doing would alone conform to all her other written declarations put in evidence on the hearing.

It is a fixed rule of law that, once established, domicil is presumed to continue, in the absence of proof of another domicil.   *Dupuy* v. *Wurtz*, 53 N. Y. 556; *Matter of Newcomb*, 192 id. 238; *Mitchell* v. *United States*, 21 Wall. 350.   In order to make out a new domicil

there must be a union of residence and intention — *factum et animus. Matter of Newcomb*, 192 N. Y. 250. In this matter before me proof of *animus*, or intention, to change, is, as I said, wholly lacking on the part of Mrs. Green. If it is to be inferred. from her extended sojourns here only, then it can only be so inferred under the exception noticed above, and I have already held that her residence here was of a kind inadequate to bring her within the exception.

That Mrs. Hetty Green's domicil was Vermont and not New York is, I think, clearly established. Under the decision of the Appellate Division in *Matter of Martin, supra,* this finding would conclude her last residence under the Taxable Transfer Act of New York, for in *Matter of Martin,* as I understand it, it was held that a resident, referred to in that act, was one whose domicil was in New York. It is, however, now urged on the part of the state of New York that a recent act of this state (Laws of 1916, chap. 551), to which I shall refer again at length, has modified the law of domicil in this state so that any one dying here after a residence in the state for the greater part of twelve consecutive months in the twenty-four months next preceding death is to be deemed domiciled here. But if domicil is still the test of liability under the Taxable Transfer Act, I think this contention cannot be sustained. Chapter 551, Laws of 1916, affects the law of domicil only in so far as to continue a residence for the greater part of twelve months *prima facie* evidence of one element of domicil. This was the construction accorded in substance to a not dissimilar act of Ohio (*Rockefeller* v. *O'Brien,* 224 Fed. Rep. 541), and I think the construction is sound for ourselves. The act (Laws of 1916, chap. 551), therefore, can have no conclusive effect on the domicil of Mrs. Green, unless she herself is proven to have

intended to relinquish her domicil in Vermont and to reconstitute it in New York. Now, there is no proof in the record of any such intention on her part. · But there is another construction of chapter 551, Laws of 1916, which I feel bound to consider.

If I am in error in assuming that the Appellate Division, in *Matter of Martin,* intended to hold that the Taxable Transfer Act means by " resident " one domiciled here, then that act operates on two classes of successions: (1) those derived from residents, and (2) those derived from non-residents. Residence results from facts alone, not from intention. In law residence in something other than domicil. That it is competent for the legislature of the state of New York to tax successions from residents of the state, irrespective of their domicil, I do not doubt and have so stated before in *Matter of Morgan,* 96 Misc. Rep. 455. If a person whose domicil is not in this state voluntarily enter this state, and actually reside here, those taking in succession from her have no valid ground of complaint if she has been subjected to many taxes from which a non-resident, by the usage of nations, would have been exempt. Chapter 551, Laws of 1916, recently enacted, attempts to prescribe what constitutes a residence for the purpose of the Taxable Transfer Act. Chapter 551, Laws of 1916, purports to amend section 243 of the Taxable Transfer Act (Laws of 1909, chap. 62). The relevant portion of chapter 551, Laws of 1916, is as follows: " § 243. Definitions.  *  *  *  For any and all purposes of this article, and for the just imposition of the transfer tax, every person shall be deemed to have died a resident, and not a non-resident, of the state of New York, if and when such person shall have dwelt or shall have lodged in this state during and for the greater part of any period of twelve consecutive months in the

twenty-four months next preceding his or her death and also if when by formal written instrument executed within one year prior to his or her death or by last will he or she shall have declared himself or herself to be a resident or a citizen of this state, notwithstanding that from time to time during such twenty-four months such person may have sojourned outside of this state, and whether or not such person may or may not have voted or have been entitled to vote or have been assessed for taxes in this state; and also if and when such person shall have been a citizen of New York sojourning outside of this state. The burden of proof in a transfer tax proceeding shall be upon those claiming exemption by reason of the alleged nonresidence of the deceased. The wife of any person who would be deemed a resident under this section shall also be deemed a resident and her estate subject to the payment of a transfer tax as herein provided, unless said wife has a domicil separate from him.''

It is urged by the representative of the state of New York that the act of 1916, as a mere amendment of section 243 of the Taxable Transfer Act, is to be justified and upheld as an extension of a classification of persons or successions subject to taxation in that it only defines '' residents '' and excludes certain persons from the class or status of non-residents. It is argued that it is entirely competent for the legislature to so enact, and that the contrary should not be held until an emergency arises. On the other hand, on the part of the executor of Mrs. Green it is urged that the act of 1916 is not a classification, but a mere statutory statement of a rule of evidence, to be entertained by the courts of the state under well-settled restrictions consonant with justice and established rules of judicial procedure. In other words, it is contended for the executor in substance that the statute furnishes a rule

which governs the courts' procedure only on a *prima facie* case, and that the amendment is not conclusive in any other case, nor does it attempt to state a principle of substantive law. It is also urged in particular that chapter 551, Laws of 1916, does not affect the succession or tax to be laid in this matter because it is not retroactive in operation in any respect and therefore it does not embrace the inception of Mrs. Green's residence in this state, which was prior to the passage of the act. If this is so, her succession is not within the act. Such in substance, as I understand them, are the elaborate contentions of the parties in reference to the act of 1916. I will now proceed to the application of the act of 1916, assuming it to be relevant.

Section 220 of the Tax Law enumerates the various methods of transfers of property that are taxable under the Transfer Tax Law of this state. It divides the persons who make the taxable transfers into two classes — resident and non-resident; and it provides, generally, that the intangible property of a resident is taxable wherever such property may be located, while the intangible property of a non-resident, even when located in this state, is not subject to a tax. Therefore, in so far as intangible property is concerned, the classification provided in section 220 of the Tax Law is " resident " and " non-resident." It is obvious that if the legislature intended to add a new classification it would have amended the only section in the Tax Law which provides for such a classification, namely, section 220, instead of putting the amendment in the section devoted to definitions. Besides, if the legislature had intended to create a new classification of persons whose property when transferred in the manner specified in section 220 of the Tax Law would be subject to a transfer tax, it is reasonable to assume that they

would have provided for the imposition of a tax on such transfers, but no such provision is made, for the taxation is on the transfer of property of residents, wherever situated, and on the tangible property of non-residents when located here. As the legislature, therefore, did not amend the section of the Tax Law which classifies the persons whose estates are liable to tax, and did not specify what property of the persons embraced within the alleged classification would be subject to a tax in this state, it is evident that the amendment of section 243, effected by chapter 551 of the Laws of 1916, did not create a new classification of persons whose property, when transferred in the manner provided by section 220, would be liable to taxation.

On the part of the state comptroller it is further contended that under the amendment effected by chapter 551 of the Laws of 1916, the decedent must be deemed a resident of this state within the meaning of that term in section 220 of the Tax Law, if it appears that she lived here more than six months of the twenty-four months immediately preceding her death. The portion of the amendment referred to reads as follows: " For any and all purposes of this article and for the just imposition of the transfer tax every person shall be deemed to have died a resident, and not a non-resident, of the state of New York, if and when such person shall have dwelt or shall have lodged in this state during and for the greater part of any period of twelve consecutive months in the twenty-four months next preceding his or her death." The word " deemed " is used in many sections of the Tax Law, and has been construed to mean that certain facts therein described shall have a certain legal effect, and that the facts being admitted the legal effect is conclusive. I am inclined to think that the legislature in the amendment

effected by chapter 551 of the Laws of 1916 used the word " deemed " in the same sense in which it was theretofore used in various sections of the Tax Law, and that proof of the facts subsequently enumerated in the sentence in which the word is used was to be conclusive upon the question of a decedent's residence. That this was the intention of the legislature is apparent from an independent sentence in the amendment, which reads as follows: " The burden of proof in a transfer tax proceeding shall be upon those claiming exemption by reason of the alleged non-residence of the deceased." If the word " deemed " in the earlier part of the amendment were intended by the legislature merely to place upon the person claiming nonresidence the burden of proving it, there would be no need of adding the independent sentence just quoted.

I cannot, however, agree with the contention of the state comptroller that the legislature by the amendment above quoted intended that a person who dwelt or lodged here for a period of six months and one day of the twenty-four months immediately preceding such person's death is to be deemed a resident of this state for the purpose of the transfer tax. Such an interpretation would result in such manifest injustice that I should be unwilling to accept it, unless the words of the statute were so clear and unequivocal as to admit of no other interpretation. It would, for instance, make a person a resident of this state and his estate subject to taxation as such, if he lived here for six months and one day and then sold his home here, bought a home in New Jersey and went immediately to live in the New Jersey home and lived there until the date of his death, seventeen months and twenty-nine days afterwards. I will not, therefore, assume that the legislature intended the effect which would necessarily result from the interpretation contended

for by the state comptroller. I think that the use of the word " consecutive " shows that it was the intention of the legislature to make it essential that a person live in this state some part of each of twelve consecutive months, and in the aggregate the greater part of such twelve months of the twenty-four immediately prior to his death before he would be deemed a resident for the purpose of the Transfer Tax Act. As the statute was not intended to apply to a case where the residence of the decedent was not in dispute, but only to those cases where it was contended on behalf of the estate of a decedent that he was a non-resident, this interpretation would apply only to cases where the question of residence was in dispute, and, as the legislature makes the legal effect of the facts conclusive upon the question of residence, I am inclined to that interpretation which bears less heavily upon the taxpayer.

From the conceded facts and the evidence in this case I find that the decedent resided at Bellows Falls, Vt., from July 3, 1914, to August 15, 1914; that she resided in this state from August 15, 1914, to July 19, 1915; that she resided in Bellows Falls from July 19, 1915, to September 1, 1915; that she resided in this state from September 1, 1915, to October 1, 1915; that she resided in New Jersey from October 1, 1915, to November 24, 1915, and that she resided in this state from November 24, 1915, to July 3, 1916, except that she stayed in Hoboken for a few days not exceeding a week at about the beginning of the year 1916. From these facts it appears that decedent did not reside in the state of New York for some part of each of twelve consecutive months of the twenty-four immediately prior to her death, and under my interpretation of the amendment effected by chapter 551 of the Laws of 1916 she is not to be deemed a resident of the state of

New York for the purpose of the transfer tax within the meaning of that amendment.

The proceeding will therefore be remitted to the transfer tax appraiser for the purpose of appraising the estate of the decedent as a non-resident of this state under section 220 of the Tax Law.

Decreed accordingly.