Matter of the Transfer Tax upon the Estate of HETTY H. R. GREEN, Deceased.

(Surrogate's Court, New York County, October, 1919.)

Appeal — meaning of " doing business "— non-residents — transfer tax — Tax Law, § 220(2).

The investment and reinvestment of a person's own money does not constitute " doing business " within the meaning of section 220(2) of the Tax Law.

On appeal by the state comptroller from an order assessing a transfer tax upon the estate of a non-resident, a finding of the transfer tax appraiser that decedent in making, in this state, regular and frequent investments and reinvestments of her own money was not at the time of her death engaged in "business" in this state within the meaning of section 220 (2), will be affirmed.

Appeal by the state comptroller from an order assessing the transfer tax.

Lafayette B. Gleason (John B. Gleason, of counsel), for state comptroller.

Alexander & Green (Charles W. Pierson, of counsel), for executor.

Fowler, S.  The appeal of the state comptroller from the order assessing a tax upon the estate of the late Mrs. Hetty Green brings up for review the finding of the appraiser, that she was "not doing business in this state," within the meaning of that phrase in the last clause of subdivision 2 of section 220 of the Tax Law. The notice of appeal contains also a statement that the state comptroller wishes to have reviewed in the Court of Appeals the order of this court and that of the Appellate Division confirming the order of this court to the effect that the deceased did not have her domicile in this state at the time of her death.  As the issue of domicile is *res adjudicata,* in so far as this court and the court of the Appellate Division are concerned, it cannot be further considered on this appeal.

The history of the taxation of this estate is somewhat peculiar.  The deceased happened to be a woman of large estate, familiarly known to the public and the authorities, and there is some reason to suppose that the latter counted on her succession to augment the

Surrogate's Court, New York County, October, 1919. [Vol. 109.

resources of the public treasury. Had Mrs. Green's estate in her lifetime been managed by agents or attorneys, as is the custom with most women of her condition, the present substituted contention of the state comptroller — that she was engaged in business in this city — would, in all probability, not have been made.

When Mrs. Green came to die, at the outset of the contention over death duties, due to the state on her succession, the taxing authorities *first* claimed that she had died a resident of this state, and that her estate was taxable as that of a non-business resident. I found that she was not a resident of this state, but of Vermont, and therefore not taxable on the ground of residency. My judgment was affirmed on appeal. 99 Misc. Rep. 582, 179 App. Div. 890. Defeated in their claim as to Mrs. Green's last domicile, the state next turned about, and asserted that her capital was employed in " business " in this state, and was for that reason taxable. This point, after due deliberation, I also decided adversely to the state of New York. 102 Misc. Rep. 45. The Appellate Division, however, reversed my judgment on that last point (184 App. Div. 376), and remitted the taxation for further inquiry, on very general principles I think, with due deference, of an administrative, rather than a legal, nature. Under the authorities no legal error by me was specified by the Appellate Division, nor could be, for no evidence had been excluded by the appraiser except under the authority of the Supreme Court of the United States.

As the Appellate Division did not specifically indicate the particular questions which they deemed improperly excluded by the appraiser, the appraiser to whom the matter was again remitted, in accordance with the direction of the Appellate Division, thought

it best on the rehearing to admit all the evidence of any kind submitted by the state comptroller.  Thus the last inquisition conducted by the appraiser in relation to the " business " of the deceased in this state prior to her death is now very full, and the appraiser's report contains all the facts which a painstaking and thorough investigation on the part of the attorney for the state comptroller could by any ingenuity develop. The second inquisition, so directed as aforesaid by the Appellate Division, was, in other words, so conducted as to enable the state comptroller to submit all the evidence in his possession tending to prove, either inferentially or otherwise, that the deceased at the time of her death was doing business in this state.  And again the appraiser has found that Mrs. Green was not doing business in this state within the meaning of subdivision 2 of section 220 of the Tax Law.

It is important, I think, to notice that in the conclusion of the opinion by Mr. Justice Shearn (184 App. Div. 376) it was said: " Such an inquisition should not be made oppressive or vexatious but, being prosecuted in good faith, should be sanctioned in so far as it tends to develop relevant facts.  This amendment of the statute may result in an enormous gain for the State in taxable property, and save for the State great sums in taxes which have hitherto been lost *by the practice of persons who, having great fortunes invested as capital in this State, escape their just share of taxation for the protection that the State affords to their capital by maintaining a domicile in some other State.*  Respecting the inquisition which the law authorizes the Comptroller to make in order to determine whether the estate of a decedent is subject to taxation, the policy of the court should be one of encouragement and not of repression.  The order

appealed from should be reversed and the taxing order modified by directing that the report be remitted to an appraiser for the purpose of ascertaining the amount of capital invested by the decedent in the State, and whether the decedent was doing business in the State, with costs to appellant.''

It is obvious that the portion of the opinion just quoted refers to both economic matters and matters purely of public polity.  There was nothing in the evidence to warrant any implication that in this state any rich escaped taxation, or that Mrs. Green was among those who so did escape.  It may be so, but such an inference was *dehors* the proofs in this case.  Consequently I feel at liberty, but for strictly juridical and ethical purposes, to consider the same economic matters and matters of public polity outside of the case, but at greater length.  In democratic republics, with universal suffrage, the growing danger of injustice is not to the poor, but to people of property.  We should remember that other great states have failed in the past when the country swarmed with a consuming hierarchy of extortion, and the receivers of taxes outnumbered the taxed, who were destroyed under forms of law.

Before proceeding, let me refer first to the several inconsistent positions before mentioned of the state taxing agents.  Formerly in all legal proceedings a party public or private, having relied on an express state of facts as the basis of legal relief, was not permitted aferwards to shift his ground by a subsequent assertion of other matter, absolutely contradictory of the first state of facts set forth in the earlier position or pleading.  It was then held in law, as it is still maintained in logic, that inconsistent assertions are mutually destructive.  There was manifestly great

Misc.] Surrogate's Court, New York County, October, 1919.

good sense in this conclusion, for in logic no proper argument can be carried on when the premises are contradictory, and in law no relief ought to be obtainable where the plaintiff relies on contradictory facts. Although in modern times inconsistent defenses are freely tolerated, inconsistent causes of action, I am happy to say, are not yet regarded with much favor by the courts. *United States V. Co.* v. *Schlegel,* 143 N. Y. 541; *La Societa Italiana* v. *Sulzer,* 138 id. 468. In tax inquiries of this kind the growing judicial tendency seems to be to allow the state authorities the greatest latitude, whether their positions or claims against citizens are consistent or inconsistent. Many courts seem to think that in mixed controversies, partly legal and partly economic or political, the state authorities stand in a different position from other claimants. As a tax proceeding is a *quasi* litigation, this deference to the sovereign people may be, perhaps, politically and morally justifiable on that ground, although personally I venture to think not.

It is common knowledge that the scope and objects of taxation by the state are being greatly extended in modern times. It is claimed by people of property that they are being more and more placed at a relative disadvantage in the state and nation, with the growing danger that both private right and private property as hitherto understood may be subverted. That the modern processes of taxation are being subtly misapplied to the ends of the socialistic movement is generally admitted by professional economists. All sorts of social reforms, to be brought about through processes of taxation, are in the political air, with the result that to many deep-thinking men the economic future is full of dubious signs. Some, indeed, profess that a political and social strife has already been

declared in the regions of taxation, and people of property are beginning to claim that taxation in aid of social reform is a clear usurpation and unconstitutional. It is in such a moral and political atmosphere, whether we like it or not, that this simple case, and hundreds like it, come on at the present time to be heard by the courts. When taxation enters on a phase of social and political strife between the taxing authorities of the people and the taxed, it is obvious that nothing connected with the history of taxation is likely to be ignored even in courts of justice.

But if wholly irrelevant in courts of justice it is useful in argument to notice the character of some of the objections now being urged by taxpayers to modern schemes of taxation. They say, for example, that an examination of the budget of most states discloses that the annual tax levies are devoted, first, to the improvident funded or interest-bearing debt and next to public improvements or social betterments, and only lastly to the purpose of carrying on the business of government. This they assert is unjust and unconstitutional, and many claim that there ought not to be a state funded debt, or taxation for any other object than carrying on the expenses of actual government. No good citizen objects to taxation, I take it, when the tax is levied for the actual purposes of government itself. Many taxpayers do object to the new and more extended purposes and objects of modern taxation. Some object to a funded public debt because it engenders extravagance and waste and war.

The existence of a public debt came very late in the history of European states, and in England it does not antedate the reign of William and Mary. The doubtful honor of inaugurating deferred public debts in England is due to Charles Montague, Earl of

Halifax, who on December 15, 1692, proposed to raise a million of money by way of a loan and thus decrease the taxes. Soon after 1692, and the inauguration of a permanent public debt in England, the distinguished philosopher and historian, David Hume — no mean economist — denounced the new expedient of a national debt as unsound, and he prophesied that debts incurred on the public credit would ultimately destroy the state. There is now a disposition in some quarters to regard Hume's conclusion as not devoid of foundation. Economists are beginning to be extremely apprehensive about the results of modern democratic theories of both taxation and permanent public debts.

We have now noticed, but only rapidly and cursorily, some of the great economic and philosophic claims, now being made, concerning schemes of modern taxation. It ⁚ ⁚s not been thought necessary to detail the socialistic claims. The leveling principles of the socialists and collectivists are, in regard to taxation of the rich, already only too familiar. The public discussion concerning constitutional taxation would not have been noticed at this time had it not been for the reason mentioned at the outset. To every public question, including taxation, there are two sides. One is apt to be as right as the other. The truth is generally to be found *in via media.*

The foregoing recital of the public controversy, now being waged in regard to taxation, is somewhat unusual, and it may be thought to have no proper place in an orthodox legal opinion — which is traditionally a dry, formal syllogism, too often logically defective, but usually more or less condensed, according to the superior skill in that line of the particular judge. While a long discussion of the moral atmosphere of the subject matter of litigation may not be relevant

**120**          MATTER OF GREEN.

to points of law raised in a particular litigation, it may, nevertheless, be important to the result.   This fact was recognized by the great leaders of the bar in classical times, and is still recognized on the continent of Europe.   It has been well said " that the ancient legal arguments, so familiar as standards of forensic skill to modern scholars, were always irrelevant according to the rules of modern Anglo-American procedure."   But we must remember that nevertheless it has been also said that such arguments reflected great credit on the standards of ancient civilization.

The question thus presented to me for determination is whether the additional evidence submitted to the appraiser upon the new hearing warrants a conclusion contrary to that at which I arrived in my prior decision.   102 Misc. Rep. 45.   I have given careful consideration to the opinion of the Appellate Division directing a reversal of the order entered on my previous decision, but have been unable to discover there the enunciation of any principle determinative of the question presented by the facts upon which the conclusion of the appraiser is based.   That court in the course of its opinion did state (p. 380):  " The evidence taken before the appraiser is insufficient to determine whether Mrs. Green was merely making investments of surplus income from time to time, and if so, whether this was done in such a manner, in such volume, and so regularly and frequently as to present the question whether the course of dealing constituted doing business; or, on the other hand, whether she was engaged in the business of money lending."

The sentence quoted would seem to indicate that the learned justice who wrote the opinion of the Appellate Division was inclined to think that money lending by a capitalist, or the making of investments of sur-

plus income from time to time in this state, when done regularly and frequently by a non-resident, a citizen of another state, would constitute doing " business " in this state within the meaning of the last clause of subdivision 2 of section 220 of the Tax Law. If such intimation were established law, the evidence in this matter might possibly justify a finding that the intangible property of the decedent invested here was subject to a tax under subdivision 2.of section 220 of the Tax Law, if it is shown that the late Mrs. Green loaned her own money, and invested considerable sums of money in securities in this state, and not only reinvested the interest or dividends on such investments, but frequently changed the form of such investments. In the absence, however, of a formal, jurisdictional and authoritative statement of the law by any court to that effect, I am inclined to adhere to the opinion expressed by me when the matter was first before me for consideration, viz., that the investment and reinvestment of a person's own money does not constitute doing business within the meaning of subdivision 2 of section 220 of the Tax Law.

Precisely what the Tax Law (§ 220, subd. 2, " or when the transfer is by will or intestate law of capital invested *in business* in the state by a non-resident of the state *doing business* in the state * * * ") intends by doing " business " is ambiguous. The use of an equivocal term such as " business " in a statute is certainly unfortunate. Equivocal terms should never be employed in drafting statutes. Such words as " trade," " commerce," or " brokerage," on the other hand, have a settled and definite common-law meaning, and could, I think, with advantage have been substituted for the word business in section 220 of the Tax Law. To ascertain the meaning of words we must

not hesitate to resort to any source of information, even that furnished by intelligent pedantry.

In all languages the word " business " standing alone, is equivocal, or one which depends on context for its definition, e. g., *private business* is not *public business*. For this reason the definitions of " *business*," contained in English dictionaries, are not regarded by courts as adequate for legal conclusions. *People ex rel. Parker Mills* v. *Commissioners of Taxes,* 23 N. Y. 242. Although the lexicographers fail us, in this instance, there are certain settled grammatical and logical principles which logicians and the grammarians employ in order to determine when a vocable is absolute or relative in meaning, complete in itself or of an adjective character. These principles can aid us. All words are either equivocal or without equivocation, that is to say, relative or absolute in meaning. So all verbs are either of complete or incomplete predication. *Res* and *negotium* in Latin, *pragma* in Greek, *chose* in French, " thing " and " business " in English, are specimens of equivocal words which require to be complemented, as the grammarians say, by amplification and qualification or locution before an accurate logical or legal definition is possible. They are words of compound significance, not simple terms. Now, the noun " business " is the correlative abstract of the neuter verb " to be busy." This particular verb is used only in the middle voice in Greek or French, and it is so used logically in English. Verbs used only in the middle voice are incomplete in significance and predication. Such are the tests, I believe, by which the scientists, logicians and grammarians determine whether terms are or are not definable of themselves. By the tests indicated the noun " business " and the verb " to be busy " have no definite meaning standing alone.

It is also obvious, as the cases hold, that the word "business" standing alone has not an established legal meaning.  For this reason courts in affixing a complement, in order to arrive at a legal definition in a particular instance, should never supply the complement by a resort to political or economic theories, always transitory, unless in a few instances when *a priori*.  Otherwise economic or political bias of individuals composing courts may attach opposite meanings to ambiguous terms in tax laws, according, for example, as the politics or the political economy of the moment favors the poor or condemns the rich of the community.  Definition in courts of justice should depend on the law and the law alone, which knows neither poor nor rich except in action *in forma pauperis*.  In law every individual is *persona*.  It was for this reason that I have given a short history of some indeterminate principles of taxation in order to rebut the implication that the rich should be condemned or the poor favored in tax cases by a judicial definition.

I have stated that the word "business" is not a technical term of the common law.  Every science has its appropriate terminology.  In drafting statutes it is highly desirable to employ such terms as "trade," "commerce," etc., which have a settled meaning by the common law, for at each repetition of such terms they retain the common-law significance.  *Despard* v. *Churchill,* 53 N. Y. 192, 199; *Perkins* v. *Smith,* 116 id. 441; *Waters & Co.* v. *Gerard,* 189 id. 302, 309; *South Carolina* v. *United States,* 199 U. S. 437, 449, 450.

How equivocal the noun "business" really is will be readily perceived by trite examples.  If a master is engaged in playing a game his servant may reply to a visitor, "You can not see the master now, he is

Surrogate's Court, New York County, October, 1919.     [Vol. 109.

busy; " the business being a game of whist. A gentleman gone out to a church vestry meeting is sometimes said to have gone " out on business " or to be engaged on business. If I go a-fishing in this state I am not a-doing business there, but if a fishmonger goes a-fishing to replenish his stall in this city he is doing business within the Tax Law. It is because of the ambiguity denoted that the courts properly say that the colloquial word " business " if used in statutes is among the most indefinite in the English language. *People ex rel. Parker Mills* v. *Commissioners of Taxes,* 23 N. Y. 242; *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 171; *Smith* v. *Anderson,* 15 Ch. Div. 247, 258.

No adjudication in the courts of this state or in the federal courts which is decisive of this appeal has been cited to me. *Dicta* of either foreign or domestic courts, however respectable, are not adjudications. It must be obvious that a repetition of the same character of transactions is not, as sometimes said in the cases, the true test of " business," as contradistinguished from investment or employment of capital by a non-business person. It is easy to conceive of an organized speculative " business," conducted by a firm regularly organized for trade, where every successive transaction is entirely different from all its predecessors. That firm ought to be held to be engaged in business notwithstanding its transactions all differ and are never repeated.

No matter how often repeated or continuous transactions may be, if conducted by persons not in trade or commerce for purposes of investment of capital and income, they do not, I think, constitute " business " within the meaning of the Tax Law. *Smith* v. *Anderson,* 15 Ch. Div. 247. Investments, for example, even the most speculative, if made by executors or

trustees of an estate, even though often repeated and continuous, would clearly not constitute doing " business " within the meaning of the Tax Law. It is not, then, as sometimes said in the cases, the repetition of transactions, or even their continuity, which is the legal test of doing business. The business intended by the Tax Law is some common-law business, carried on by a recognized trader, mechanic, shopkeeper, merchant, banker, broker, manufacturer, or by some person other than an owner of a private estate for the benefit of that estate alone.

Nor is an elaborate office organization the legal test of doing business. Large private estates often require clerks, bookkeepers and sometimes an extensive office. They constantly reinvest surplus moneys, collect rents and dividends, often buy shares or other securities and resell them, and yet the management of the estate is not, I think, to be regarded as engaged in business in the sense in which a trader, a merchant or a broker is engaged in business. The management of an estate is not the doing of business within the meaning of the law. A person living on his rents and the profits of capital is not " doing business " at common law, because he reinvests his surplus or loans his capital wherever he can to his advantage.

I have been able to find no adjudications decisive of this matter and none have been cited to me. When our own law furnishes no precise authority for the solution of legal problems it is always well to look into that great fountain of modern rights and legal principles, the Civil Law, and see what illustration, if any, it offers. While such an illustration would not in our system be authoritative on such a point as this now before me, it will be instructive, because it discloses the best and most highly scientific legal thought of all the ages known to us.

Surrogate's Court, New York County, October, 1919. [Vol. 109.

In Rome in the days of the republic certain kinds of money transactions were already divided into public and private, *publicum vel privatum negotium.* Business men were then classed in law as *negotiatores* and *publicani.* The business of. a public character was conducted by those called "*publicani*," organized in joint stock associations known as "*societates publicanorum.*" See Cic. *de provinciis consularibus* V. 12. There is little doubt now entertained I think by the best scholars, that shareholders in the Roman *societates publicanorum,* although not *publicani* were not *negotiatores.* In other words, although interested in the profits of the public undertaking, they were not personally engaged in that business. In this respect our modern law conforms precisely with the Roman Law. *People ex rel. Parker Mills* v. *Commissioners of Taxes,* 23 N. Y. 242; *McCoach* v. *Minehill Railway Co.,* 228 U. S. 295.

It is a curious parallel, worth mentioning, that the dealings of these Roman shareholders, 2,000 years ago, in shares of the public companies were ordinarily conducted in the forum which is only lately beginning to be recognized as having been among many other things a sort of Roman stock exchange or bourse. Cicero himself, as well as most of his friends, was much mixed up in the forum, as shareholders with these public companies, of one of which he admits that he was also counsel. But nowhere are Cicero .or his friends classed among the *negotiatores.* They were simply what in modern times in America are popularly known as " capitalists " or investors.

" Capitalist " has no legal meaning and it is used colloquially often in a wrong sense. In some provincial cities of this country it is not unusual to see gentlemen of inherited fortunes, never engaged in business of any kind, described in the city directories and local journals as " capitalists." I know of such instances.

Misc.]   Surrogate's Court, New York County, October, 1919.

This classification of the directories seems to be in deference to some extreme democratic conception that every possessor of capital is " in business." Popularly every one in America is presumed to have some sort of occupation, and consequently, men of fortune, of no precise calling, are, by directory makers, sometimes described according to the imaginary business, roughly presumed in some sort to be carried on by all men of means.

That inexhaustible reservoir of juridical conceptions, the Roman Law, recognized two thousand years ago a distinction between "capitalists " who loaned their own money for their private account and bankers and other " *argentarii* " who acted as middlemen in making loans, keeping what was called " *tabernae argentariae*," or " money shops," where the public resorted, whereas the Roman capitalists kept no such shops and were not classed among the " *negotiatores*," or people of business. The people who kept *tabernae argentariae*, or money shops, were *negotiatores*, or engaged in business. It is very clear that in Roman Law a rich Roman two thousand years ago might have loaned and invested and reinvested her billions of sesterces at her private chambers, or private office, if you please, without any danger of being classed by the public authorities with the *negotiatores*, and accused of carrying on " business," provided she had not opened a *taberna argentaria*, or money shop, where the public could resort for transactions of their own. Now this the evidence before the New York appraiser shows that Mrs. Green never did. She kept no " open shop " or place of resort for the public. She made no transactions but her own, and in a legal sense such transactions were not her " business " but her private affairs, of no actual or lawful concern to the state.

The appraiser's report shows that Mrs. Green's investments in the state of New York consisted of deposits in banks, mortgages on New York real estate, purchases of New York city bonds and corporate stock, and certificates of deposit. It also shows that she invested in similar securities or deposited in banks to her credit the income derived from these investments, and that a substantial part of the deposits in banks consisted of income from her various investments. There is, however, no proof that she maintained an office in New York for the transaction of business, or that she held herself out to the public as a banker or a broker or a money lender. Her business consisted in caring for her own property. The Westminster Company, which was incorporated under the laws of New Jersey, with a capital stock of 1,250 shares, of which 630 belonged to the decedent, was organized for the purpose of taking over her active investments or those which required a frequent signing of papers. The books of the company show that at the time of Mrs. Green's death it owed her about $26,000,000. Her son was the president and active head of the company. When her securities were transferred to the company their value was credited to her account on the books of the company, and the company was debited with a corresponding amount. When, however, the interest or dividends on such securities were received by the company, they were distributed to the stockholders in the form of dividends, and not credited to the personal account of the decedent. The company, therefore, was not an agent of the decedent in the transaction of her business, but a corporation transacting its own business of investing and reinvesting securities. It seems to me, therefore, that, as stated in my previous opinion (102 Misc. Rep. 45), the business conducted by the Westminster Company was not the

business of the deceased, and that the transactions of the company did not constitute the doing of business by the decedent in this state within the meaning of subdivision 2 of section 220 of the Tax Law. *People ex rel. Parker Mills* v. *Commissioners of Taxes,* 23 N. Y. 242; *McCoach* v. *Minehill Railway Co.,* 228 U. S. 295.

If a tax law does not expressly include property it cannot be taxed by implication. Taxing acts are construed strictly and when dubious against the state. Should this appeal be decided in favor of the state comptroller, I cannot see why citizens of other states who systematically speculate in brokers' offices in the city of New York, or who loan their foreign money regularly to banks in this city, do not also come within section 220 of the Tax Law. If so, the tax law will either have to be amended or New York will soon cease to be the monetary centre of the United States. It may be that Mrs. Green selected a domicile where succession taxes would not molest her succession unduly, but that is no reason for subjecting her estate to a law which was not intended to cover operations like hers in the money centre of the United States. Should her succession be condemned in this instance it would be one of those unfortunate errors which the feebleness of humanity commits on occasions, and it would be disastrous to the wellbeing of the state.

The additional evidence submitted to the appraiser does not for the reasons stated, in my opinion, warrant a finding by the court that Mrs. Green at the time of her death was engaged in business in this state within the meaning of subdivision 2 of section 220 of the Tax Law. The order fixing tax will therefore be affirmed.

Order affirmed.