In the Matter of the Appraisal, under the Transfer Tax Law,
    of the Estate of HETTY H. R. GREEN, Deceased.

EUGENE M. TRAVIS, Comptroller of the State of New York,
    Appellant; EDWARD H. R. GREEN, as Executor, etc.,
    Respondent.

First Department, May 14, 1920.

Taxation — transfer tax — Tax Law, section 220, construed — when
    non-resident engaged in financial transactions was doing business
    here — when property so invested subject to transfer tax.

Section 220 of the Tax Law, relating to a transfer tax on the property of a
    non-resident doing business in this State, was designed to reach the
    property of such person invested in business within this State at the
    time of her death.
In a proceeding to assess such tax upon the property of a deceased non-
    resident it appeared among other things that although a resident of
    another State the deceased carried on large business transactions in this
    State and to that end organized certain corporations to act for her; that
    through said corporations, and also personally, she made large loans within
    this State, and that her entire time and attention were given to financial
    business and to the investment and reinvestment of her principal and
    income.  On all the evidence, *held*, that the moneys thus invested in this
    State were subject to taxation under section 220 of the Tax Law, she
    being engaged in business within this State within the contemplation of
    said section.
It is immaterial that the deceased did not maintain a public office to which
    she invited the public for the purpose of making loans.

APPEAL by Eugene M. Travis, Comptroller, etc., from an
order of the Surrogate's Court of the county of New York,
entered in the office of said surrogate on the 28th day of
October, 1919, affirming an order which confirmed the report
of the appraiser finding that the decedent did not have any
capital invested in business in this State nor was decedent
doing business in the State within the meaning of subdivision
2 of section 220 of the Tax Law (as amd. by Laws of 1916,
chap. 323).*

---

* Since amd. by Laws of 1919, chap. 626.— [REP.

*John B. Gleason* of counsel [*Lafayette B. Gleason*, attorney], for the appellant.

*Charles W. Pierson* of counsel [*Alexander & Green*, attorneys], for the respondent.

MERRELL, J.:

This is an appeal by the State Comptroller from a determination of the surrogate of New York county affirming an order entered upon the report of the appraiser who found that the decedent, Hetty H. R. Green, was not engaged in business within the State of New York and had no capital invested in business in this State at the time of her decease, subject to taxation.

This is the third appeal to this court from orders made by the surrogate in the matter of transfer taxes upon the estate of the above-named decedent. The first appeal was from the order of the surrogate adjudging that the decedent was a non-resident of the State of New York at the time of her death. (*Matter of Green*, 99 Misc. Rep. 582.) This court affirmed the decision of the surrogate (179 App. Div. 890), and denied the appellant's application for leave to appeal to the Court of Appeals. (179 App. Div. 928.) After the first appeal to this court the proceeding was remitted to the appraiser and evidence was offered before him relative to the amount and value of the decedent's estate, and particularly in respect to the decedent's business and capital which was claimed by the Comptroller to have been invested in her business within this State. Certain of the evidence offered was excluded, and the appraiser having reported adversely to the Comptroller and the surrogate having found that the decedent had no capital invested in this State and was not engaged in business within the State of New York, a second appeal was taken from the last-mentioned order to this court. This court modified the order of the surrogate and remitted the matter to an appraiser " for the purpose of ascertaining the amount of capital invested by the decedent in the State, and whether the decedent was doing business in the State." (184 App. Div. 376.) A new appraiser was appointed and another inquiry had at which the Comptroller submitted

a large amount of evidence concerning the value of the decedent's property claimed to be invested within this State, and also evidence which the Comptroller claims conclusively proves that the decedent at the time of her death was engaged in business within this State. The appraiser has again reported that the decedent was not at the time of her death engaged in business within this State, and that she had no property or capital invested in such business here. Upon such report an order was made confirming the same, and the order now appealed from is the order of the surrogate affirming said order of confirmation.

The question to be decided upon this appeal is whether or not the decedent at the time of her death was doing business in the State of New York, and whether or not she had capital invested in such business which is taxable under the law in reference to taxable transfers of property, within the provisions of subdivision 2 of section 220 of chapter 62 of the Laws of 1909, being the Tax Law (Consol. Laws, chap. 60), as amended by chapter 323 of the Laws of 1916, in effect April 26, 1916. Said statute imposes a tax upon the transfer of property of a deceased person, " when the transfer is by will or intestate law of capital invested in business in the State by a non-resident of the State doing business in the State either as principal or partner." Manifestly the statute was designed to reach the transfer of property of a deceased non-resident invested in the business of the decedent within this State at the time of decedent's death.

On the last appeal to this court the opinion reviewed the evidence to some extent, but, owing to the fact that material evidence had been excluded by the appraiser, it was thought best to remit the matter for further inquest. This court, however, then held that: " It is unnecessary to determine upon this appeal whether continuous investment and reinvestment as one's sole occupation and for the purpose of making money constitutes doing business, for it is quite evident, and it is not disputed, that engaging regularly, and so frequently and habitually as to constitute a course of dealing, in the practice of loaning money, would constitute doing business. The evidence taken before the appraiser is insufficient to determine whether Mrs. Green was merely

making investments of surplus income from time to time, and, if so, whether this was done in such a manner, in such volume and so regularly and frequently as to present the question whether the course of dealing constituted doing business; or, on the other hand, whether she was engaged in the business of money lending."

It, therefore, follows that we are now to determine from the evidence now before the court whether or not the decedent was at the time of her death engaged in a " business " within the statute, to wit, the business of lending money, and, if so, how much capital she had invested in such business. The various proceedings had and the orders made were all in one proceeding instituted in said Surrogate's Court upon the petition of the executor of the will of decedent, verified October 17, 1916, praying for the designation of an appraiser to fix, pursuant to statute, the fair market value of decedent's property subject to tax under the laws relating to taxable transfers of property.

Upon the first hearing before the appraiser and on the first appeal to the surrogate, the executors of Mrs. Green's estate contended that she resided without the State of New York and had her actual residence and domicile within the State of Vermont. The evidence was that during the last 730 days of her life decedent was in the city of New York at least 644 days. Upon the hearing resulting in the surrogate's decision that the decedent was domiciled in the State of Vermont, her son and executor of her will, and who is the petitioner herein, testified, in explanation of his mother's almost continuous presence in the city of New York, that she was here solely for the transaction of business. As the petitioner then testified: " My mother was nothing but business, business, business."

The evidence conclusively showed that during that period she was very actively engaged here in matters relating to her investments. For the purpose of accounting for her presence in the city of New York the executor then contended that she was here for the purpose of transacting business, and made the following concession: " It is conceded by counsel for the executor, for the purposes of this proceeding only, as

follows: From the date of the death of the decedent's husband in 1902 * * * to the time of her own death, the City of New York was the center of the decedent's business activities, and while staying at Hoboken she would ordinarily come to New York City in the daytime to transact her business. During most of this period she had one or more safe deposit boxes in New York City in which from time to time she placed important documents and securities owned by her. She constantly kept large deposits of cash in New York banks. The decedent's interests were largely centered upon the conservation and enlargement of her fortune, and practically her entire time and attention was given to business matters and to the investment and reinvestment of her principal and income."

The foregoing concession is still of the same force and effect as when made in the earlier stage of the proceeding. The position of the petitioner upon the first hearing as indicated by his testimony and the above concession is in rather violent contrast with his present attitude, that decedent was not engaged in business here at the time of her decease. Upon the first hearing the executor did not hesitate to use the term "business," in connection with the decedent's well-known financial operations in New York city. It was only when it became necessary to avoid paying taxes as a non-resident under subdivision 2 of section 220 of the Tax Law (as amd. *supra*) that the executor for the first time took the position that decedent was not transacting business within this State.

The evidence now for the first time before this court discloses that the decedent had up to the very end approximately $38,144,234.31 which the Comptroller claims was capital invested in her business within the State of New York, upon which no tax has as yet been assessed. This capital consisted of $26,608,390 to her credit in the Westminster Company, a company which had been organized by her about the year 1911, for the purpose of carrying on her individual business. From the above sum the Comptroller is willing to deduct certain capital represented by foreign stocks and mortgages, leaving a balance invested in or through the Westminster Company of $23,324,431.18. The remainder of decedent's capital which the Comptroller claims was invested in her business in this

State and not yet taxed, was represented by deposits in banks, interest-bearing bonds, securities, certificates of deposit and the sum of $682,520.40, being her credits with the Windham Company, another company also organized by decedent for the purpose of conducting her business. The evidence also shows that prior to 1914 decedent's books were kept at No. 7 West Ninetieth street in New York city, at which place the books of the Westminster Company were also kept. Up to that date no credits appear to have been carried on the books of the Westminster Company in the name of the decedent. The first of such entries in the books of the Westminster Company were made in January, 1914, and those entries taken from the books of Mrs. Green show the aggregate sum of $24,942,533.54, which had up to that time been transferred by decedent to the company. The Westminster Company was capitalized at $125,000 and the Windham Company at $10,000. All of this capital was furnished by Mrs. Green, and the money paid in by her. Both companies were controlled by her. She held 630 shares of the capital stock of the Westminster Company, 600 shares were held in the name of her son, Edward H. R. Green, 10 shares by J. H. Isbills, and 10 shares by W. K. Potter, who kept the books of the Westminster Company. From the very beginning Mrs. Green assigned to the Westminster Company practically all of her securities and received credits therefor. It does not appear that she received any interest whatever from any of these deposits or credits, but it does appear that the Westminster Company was organized expressly for the purpose of handling decedent's business. In this connection her son and executor, Col. Green, testified: " We found it difficult to handle business without getting her signature, and then we organized the company for the purpose of having more than one officer so that when I was away we could transact business and a corporation is a better form of doing it. * * * Q. What was the purpose of the Westminster Company? A. To relieve her of some of her business and to be able to have her son act for her. * * * We handled her business there at the Westminster Company. I think there were government men the last three years of her life spent three months with us checking up and she never came in. She would write in as to when they would get

through and when they left she came back again.  *  *  *
Q. How were these notes which were purchased paid for?
A. By notifying my mother that I made an investment, and
telling her that I wanted $125,000, or whatever the amount
might be, and she would give me a check for it.  Q. And do I
understand you that the note thus purchased would then
become her property?  A. No, sir, it would become the prop-
erty of the Westminster Company.  Q. Referring to your
statement upon your direct examination that such loans were
always time loans and were held by the company as invest-
ments, is it not a fact that these loans were held by the com-
pany for the benefit of your mother?  *  *  *  A. As a stock-
holder and as an individual, both, because we owed her the
money."

It is contended by the Comptroller that the decedent was
not only engaged in investing income but was also engaged in
the business of money lending, and that such business was
carried on not only by herself individually but through the
aforesaid companies.  In this connection it appears that in
1914 short term investments were on hand which had been
made by Mrs. Green through the Westminster Company, all
of the money being furnished by her to the amount of
$7,185,500.  All of these investments were represented by
promissory notes made payable in New York and running from
six months to one year.  All of this capital was furnished by
Mrs. Green, credited to her, and no part was ever withdrawn.
After January 1, 1914, the Westminster Company continued
actively in this business of money lending and made a total
amount of new loans aggregating $12,111,190.75.  It appears
that all of these loans are what is ordinarily known as liquid
capital and do not constitute any such permanent investments
as one engaged in investing capital usually makes.  On July
3, 1916, the Westminster Company held sixty-three New York
mortgages, all paid for by the money of Mrs. Green, aggregat-
ing $5,812,000.  In such transaction no money was ever
furnished by any one else, and, as above shown, her executor
testified that the company was organized for the purpose of
carrying on the decedent's business in a more convenient
manner.

The amendment to the Tax Law in 1916 was undoubtedly

made for the purpose of taxing the transfer of property of non-resident decedents invested in business in this State at the time of death. The statute is quite similar to chapter 37 of the Laws of 1855, which has been so often discussed by the courts. Prior to the statute of 1855 numerous persons doing business in this State were enabled to escape taxation, although they had large amounts of money invested here. They, however, chose to reside outside of this jurisdiction, although their property received the protection of our laws. One of the leading cases in which the above chapter 37 of the Laws of 1855 is considered is that of *People ex rel. Thurber, Whyland Co.* v. *Barker* (141 N. Y. 118). In that case Judge PECKHAM quotes the statute as follows: "All persons and associations doing business in the State of New York, as merchants, bankers, or otherwise, either as principals or partners, whether special or otherwise, and not residents of this State, shall be assessed and taxed on all sums invested in any manner in said business, the same as if they were residents of this State, and said taxes shall be collected from the property of the firms, persons or associations to which they severally belong."

And further considering the question of the taxation of such sums so invested in this State, the learned judge says, in regard to the statute: " It meant, as it seems to us, that the sum invested in any manner in business in this State should be assessed in the same manner and form as a resident would be assessed."

The case of *Hoyt* v. *Commissioners of Taxes* (23 N. Y. 224) is the first case in which the Court of Appeals carefully considered the above statute. Chief Judge COMSTOCK wrote the opinion and in commenting upon the above statute, says: " It is well known that in many instances persons having their mercantile or banking establishments in the city of New York, reside in the vicinity beyond the lines of the State, and until this act was passed such cases were apparently not within the reach of taxation. * * * If, therefore, the owner resided across the line in New Jersey, but yet controlled and managed his own business in the city of New York, there was no mode provided for taxing his assets there situated. * * * This was a very considerable mischief, and this statute was passed to remedy it."

The learned judge then reviews the development of the tax laws, and later in his opinion refers to chapter 37 of the Laws of 1855 as follows: " Then in 1855 a serious defect in the system had been developed. Non-residents of the State were found to be personally, either as principals or partners, in the possession and management of large capitals or estates within the State. * * * The system was accordingly improved and extended so as to embrace such cases."

It has been consistently held that such statutes are not only constitutional but equitable, and that non-residents doing business in this State should pay a proportionate share of the taxes.

The use of the term " doing business in the State " is criticised by the learned surrogate as uncertain and practically meaningless. (109 Misc. Rep. 112, 121.) It is, however, the same term used in the above statute and, until the present case, the courts have never seemed to be troubled about the use of the term, and taxes have been constantly levied upon such capital and property as was found within this State invested in any enterprise of a non-resident. In many cases the courts have referred to such capital as being invested in " business interests." Such is the language used in the opinion of Mr. Justice BREWER in *New Orleans* v. *Stempel* (175 U. S. 309), referring to a similar statute and to moneys of a non-resident collected as interest and principal of notes, mortgages and other securities within the State and deposited in one of the banks in the State for use on reinvestments. The learned justice says, at page 316: " They are property arising from business done in the State."

In the case of *Bristol* v. *Washington County* (177 U. S. 133) Chief Justice FULLER says, with reference to a similar statute: " ' The creditor, however, may give it a business *situs* elsewhere; as where he places it in the hands of an agent for collection or renewal, with a view to reloaning the money and keeping it invested as a permanent business. * * * The obligation to pay taxes on property for the support of the government arises from the fact that it is under the protection of the government. Now, here was property within this State, not for a mere temporary purpose, but as permanently as though the owner resided here. It was employed here as a business by one who exercised over it the same control and

management as over his own property, except that he did it in the name of an absent principal. It was exclusively under the protection of the laws of this State.'"

In the case of *Flint* v. *Stone Tracy Co.* (220 U. S. 107), which involved the taxation of corporations and the consideration of the question of where certain corporations did business, Mr. Justice DAY says (p. 171): "It remains to consider whether these corporations are engaged in business. 'Business' is a very comprehensive term and embraces everything about which a person can be employed. [Black's Law Dict. 158; citing *Parker Mills* v. *Commissioners of Taxes*, 23 N. Y. 242, 244.] 'That which occupies the time, attention and labor of men for the purpose of a livelihood or profit.' Bouvier's Law Dictionary, Vol. 1, p. 273. We think it is clear that corporations organized for the purpose of doing business, and actually engaged in such activities as leasing property, collecting rents, managing office buildings, *making investments of profits*, or leasing ore lands * * * and in some cases investing the surplus, are engaged in business within the meaning of this statute, and in the capacity necessary to make such organizations subject to the law."

In the instant case, Mrs. Green came daily to the city of New York for the admitted purpose of transacting business. She was a conspicuous character in the financial world, well known in financial and business circles. Concededly she was engaged in this State in investing her money, not only in long-term securities, but in collateral notes. She loaned large sums of money for the erection of buildings and in financing various enterprises. The word "finance" is defined in the Century Dictionary and Encyclopedia as follows: "Finance: * * * The science of monetary *business* or affairs. * * * Finance: * * * To conduct financial operations; manage finances in either a public or a private capacity."

The testimony clearly shows that Mrs. Green, as an individual, negotiated her loans, complained about rates of interest offered on mortgages, kept a large amount of her funds invested in liquid securities, thus enabling her to take advantage of fluctuations in the money market, especially in respect to call money, and was otherwise engaged in this State as a money lender. The president of the Title Guaranty and Trust

Company testified that decedent was a very frequent visitor at his office, purchased mortgages in large numbers, and that her son, the colonel, was simply a messenger. This fact the latter seems to admit in his testimony, as he says he consulted his mother about all of her investments. The learned surrogate, in considering the question as to what is meant by the term " business," seems to rely largely on similar situations which he says might have arisen in ancient Rome. The surrogate says: " It is very clear that in Roman Law a rich Roman two thousand years ago might have loaned and invested and reinvested her billions of sesterces at her private chambers, or private office, if you please, without any danger of being classed by the public authorities with the *negotiatores,* and accused of carrying on ' business,' provided she had not opened a *taberna argentaria,* or money shop, where the public could resort for transactions of their own." (109 Misc. Rep. 127.)

The surrogate, therefore, bases his decision that the decedent was not engaged in business in this State upon the fact that she did not have a public place of business into which she invited the public for the purpose of permitting the public to transact in such place their own business. Surely this two-thousand-year-old illustration is hardly applicable to the instant case. Capitalists of the present day who make a business of loaning money would hardly think of opening a public resort for the transaction of such business. It would seem that the gigantic and numerous loans made by the decedent from her liquid estate were operations which in our American way of thinking classes the decedent as one engaged in business. It is hardly consistent with our American ideas to say that the only capitalists who are engaged in business are those who follow the vocation of money lending in a place open to the public for such purpose. It is true that decedent had no office open to the public, and placed no money lender's sign or device above her door. Nevertheless, her whereabouts was well known and she was frequently and constantly sought by those who would borrow her money, and she herself went about loaning it. In fact, the evidence is replete with facts showing decedent's constant and persistent endeavor to obtain for herself larger loans and good securities at high rates of interest. Moreover, she did not conduct her affairs at the place

of her domicile, but voluntarily came to New York city to market her money and there she made it her constant business to loan her money to the best possible advantage. Had her transactions been conducted in her individual name in a public place or office, she would undoubtedly have been a money lender and, therefore, a business woman within the rule laid down by the learned surrogate. The fact that decedent transacted her business in a manner peculiar to herself does not alter her status. She and her property were here in this State under the protection of our laws, and she was operating here for the sole purpose of obtaining the greatest return possible from her vast estate. This certainly was doing business.

The evidence now before this court, we think, conclusively shows that the decedent was engaged in business within this State, within the contemplation of subdivision 2 of section 220 of the Tax Law (as amd. by Laws of 1916, chap. 323). The greater part of her capital was, at the time of her death, in the form of credits upon the books of the Westminster Company. The fact that this company was concededly organized for the purpose of conducting her business, and that the credits on its books were taken directly from the personal books of the decedent, shows, we think, conclusively that all of those credits were capital belonging to the decedent at the time of her death used in her general business of money lending, and was capital invested in her business within the State of New York. It, therefore, follows that the moneys thus invested were subject to taxation under subdivision 2 of section 220 of the Tax Law (as amd. by Laws of 1916, chap. 323).

The order appealed from should be reversed, with costs, and the matter remanded to the surrogate for appraisal and taxation in accordance herewith.

DOWLING, LAUGHLIN, PAGE and GREENBAUM, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and proceeding remitted to surrogate for further action in accordance with the opinion of this court.